IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| CHOON JAMES, | ) | CIVIL NO. 14-00478 JMS-BMK |
| | ) | |
| Plaintiff, | ) | ORDER (1) GRANTING IN PART |
| | ) | DEFENDANT CITY AND COUNTY |
| vs. | ) | OF HONOLULU'S MOTION FOR |
| | ) | SUMMARY JUDGMENT, DOC. |
| CITY AND COUNTY OF | ) | NO. 13; AND (2) DECLINING |
| HONOLULU; and John Does 1-50 in | ) | SUPPLEMENTAL JURISDICTION |
| their individual or official capacity, | ) | OVER REMAINING STATE LAW |
| | ) | CLAIMS |
| Defendants. | ) | |
| _____ | ) | |

**ORDER (1) GRANTING IN PART DEFENDANT CITY AND COUNTY OF
HONOLULU'S MOTION FOR SUMMARY JUDGMENT, DOC. NO. 13;
AND (2) DECLINING SUPPLEMENTAL JURISDICTION OVER
REMAINING STATE LAW CLAIMS**

## I. INTRODUCTION

This is now Plaintiff Choon James' ("James") second action in this

court against Defendant City and County of Honolulu (the "City"), asserting

United States and Hawaii State Constitutional violations and state law claims

stemming from actions the City took regarding real property located at 54-282

Kamehameha Highway (the "subject property").  Although James is the legal

owner of the subject property, it is the subject of an on-going eminent domain

action in the First Circuit Court of the State of Hawaii, in which the City obtained

an Ex Parte Order of Possession (the "Possession Order") pursuant to Hawaii Revised Statutes ("HRS") § 101-29.

In the first action, *James v. City & County of Honolulu*, Civ. No. 13-397 JMS-BMK (the "First Action"), James alleged the same claims as in this action, all stemming from the City's May 29, 2013 seizure of signs she placed on the subject property. After the court denied the parties' motions for summary judgment, a settlement was reached. In this second action, James largely recycles her Complaint from the First Action, but also includes additional allegations regarding an October 18, 2013 seizure of signs and the City's alleged interference with James' contract with Reynolds Recycling Inc. ("Reynolds"), who was leasing the subject property from James. The City has counter-claimed for breach of settlement agreement.

Currently before the court are Motions for Summary Judgment brought by both parties. Based on the following, the court GRANTS in part the City's Motion for Summary Judgment as to James' federal claims, and DECLINES supplemental jurisdiction over the remaining state law claims.

///

///

///

2

## II. **BACKGROUND**

**A.     Factual Background**

Most of the facts relevant to the parties' Motions for Summary

Judgment are not only undisputed, but were previously outlined in detail in the

court's August 20, 2014 Order denying the parties' motions for summary

judgment in the First Action (the "August 20, 2014 Order").  *See James v. City &*

*Cnty. of Honolulu*, Civ. No. 13-00397 JMS-BMK, 2014 WL 4181461 (D. Haw.

Aug. 20, 2014).  The court therefore first summarizes the relevant facts as outlined

in the August 20, 2014 Order, and then addresses those facts that are new to this

action.

### *1.     Facts Leading Up to Filing of First Action*

The relevant facts, as described in court's August 20, 2014 Order in

the First Action, include the following:[1]

On April 21, 2010, the City filed an action in the First Circuit Court

of the State of Hawaii, Civ. No. 10-1-863-05 RAN (the "State Action"), against

James and her husband Mark Olov James seeking to condemn, in fee simple, the

subject property for use in the Hauula Fire Station Replacement Project.  On April

---

[1]  The court outlines the facts presented in the First Action only as are necessary for
putting this second action and its claims into context.

22, 2010, the City filed an Ex Parte Motion for an Order Putting the City in Possession of the Property pursuant to HRS § 101-29 ("Ex Parte Motion"). The City's Ex Parte Motion and its supporting evidence recites that the City is seeking condemnation of the subject property for a new Hauula Fire Station, and estimates that just compensation for the subject property is $521,000, which the City paid to the Chief Clerk of the First Circuit Court.

On April 27, 2010, the State Court entered the Possession Order. The Possession Order states in relevant part that the City "is hereby awarded possession of the real property described in the Complaint filed herein, and [the City] may do such work thereon as may be required for the purpose for which the taking of said real property, including its appurtenances and any improvements thereon, is sought."

After the Possession Order, James continued to maintain the subject property by having the lawn mowed and performing other work. And despite the Possession Order, the City imposed on James certain indicia of ownership. For example, when James failed to mow the lot frequently enough, she received a September 14, 2011 citation from the City for a "Vacant Lot Overgrown." James also received an October 4, 2011 citation from the City for "Grubbing work w/o a permit" on the subject property. James paid each of these citations, as well as the

4

tax she was assessed on the subject property from 2010 through 2013.  In comparison, the City took little action on the subject property after obtaining the Possession Order (before the seizure of James' signs, described below).  Indeed, although the Capital Budget for the City proposed funds for "Hauula Fire Station Relocation" in 2012, 2013, and 2014, these funds were deleted from the versions of the Capital Budget adopted by the City.

To protest the City's taking, James erected two signs on the subject property, which stated "YOUTUBE: Eminent Domain Abuse Hawaii," and "Eminent Domain Abuse Who's Next?"  On May 29, 2013, the City removed the two signs to an offsite storage location, damaging at least one sign in the process. At or near where the signs were erected, the City left two "Storage and Removal Notices" pursuant to Chapter 29, Article 19 of the Revised Ordinances of Honolulu ("ROH") ("Article 19"), an ordinance authorizing the City to seize personal property left on public property after providing twenty-four hours notice. When James later sought to retrieve her signs, she was asked to sign a document entitled "Release of Impounded Property" ("Release Form"), which she refused to do out of concern that signing it could affect the pending State Action.  Instead, James filed the First Action.

5

## 2.     *Facts Occurring After Filing of First Action*

After the May 29, 2013 removal of the signs from the subject property and the filing of the First Action on August 13, 2013, the City took some steps directed to the subject property.  In particular, on August 15, 2013, the City filed in the State Action a Certification stating that the City took possession of the subject property on June 4, 2010.  Doc. No. 14-17, City Ex. M.  The City also sent letters dated August 22, 2013 to James' then-attorneys (different counsel represented James in the First Action and the State Action) notifying James of the City's sole possession of the subject property.  The letters notified James that she "no longer has a legal right of possession to the Property, the Property is not open to the public, and the Property is not a designated public for[u]m."  Doc. No. 29-6, James Opp'n Ex. F; Doc. No. 14-21, City Ex. Q.  The letters further stated that neither James "nor any other person, is authorized to enter the Property for any purpose, including the placement of signs.  Unauthorized entry onto the Property shall constitute a violation of Section 708-814, Hawaii Revised Statutes and any personal property found on the Property shall be removed without notice."  Doc. No. 29-6, James Opp'n Ex. F; Doc. No. 14-21, City Ex. Q.  On September 10, 2013, the City issued tax reimbursement checks on the subject property to James.  Doc. No. 14-18, City Ex. N.

At the time the City took these actions, Reynolds was leasing the subject property from James to operate a recycling redemption center. *See* Doc. No. 29-9, Marvin Iseke Decl. ¶ 13. Reynolds had previously leased a parcel abutting the subject property from the City, and had terminated the rental agreement on June 30, 2013 after the City had sought to expand the recyclables accepted and Reynolds did not wish to do so. *See* Doc. No. 14-2, Diane Murata Decl. ¶¶ 7-9. On October 1, 2013, the City sent a letter to Reynolds notifying it of the City's Possession Order and that the City had not granted Reynolds the right to enter or use the subject property. Doc. No. 29-5, James Opp'n Ex. E.

At some point in October 2013, James placed another three signs on the subject property, which stated "YOU-TUBE: EMINENT DOMAIN ABUSE - HAWAII," "EMINENT DOMAIN ABUSE: WHO'S NEXT?," AND "NO $$$ FOR BUS! GOT $7B FOR RAIL.  MORE BUS PLS." *See* No. 29-9, Iseke Decl. ¶ 7. These signs were each several feet tall and several feet wide, and secured into the ground using deep concrete footings. *See* Doc. No. 41-1, Brad Kitsu Decl. ¶ 5; Doc. No. 29-1, James Opp'n Ex. A (photographs).

On October 17, 2013, a Removal Notice for the three signs was affixed to one of the signs, stating that personal property stored on public property shall be impounded if not removed within twenty-four hours. *See* Doc. No. 41-1,

Kitsu Decl. ¶ 5; Doc. No. 41-2, City Suppl. Ex. A.  After the twenty-four hour period, on October 18, 2013, the City seized the three signs on the subject property.  *See* Doc. No. 29-1, James Opp'n Ex. A (photographs of signs being removed); Doc. No. 29-9, Marvin Iseke Decl. ¶¶ 5-7.  To seize the signs, the City enlisted "about a dozen county workers" and also had on hand "a total of six armed policemen."  Doc. No. 29-9, Iseke Decl. ¶¶ 5, 8.  James was at the subject property at the time of this seizure, and was provided a copy of the Storage and Disposal Notice, which stated that her signs have been impounded and providing the address where they could be retrieved.  Doc. No. 41-1, Kitsu Decl. ¶ 7; Doc. No. 41-3, City Suppl. Ex. B.  The City took the signs to Halawa, which is approximately 1.5 hours away, rather than Laie, which is only 10 minutes away and where the City had previously stored the signs seized on May 29, 2013.  Doc. No. 29-9, Iseke Decl. ¶ 9.  Unlike the signs seized on May 29, 2013, however, James had no difficulties retrieving them and was allowed to alter the language of the Release Form.  *See* Doc. No. 42, Pl.'s Suppl. Ex. 1.

On October 21, 2013, the City installed a sign in the driveway of  the subject property stating:

> GOVERNMENT PROPERTY
> NO TRESPASSING
> VIOLATORS ARE
> SUBJECT TO

CRIMINAL PROSECUTION
CITY AND COUNTY OF HONOLULU

Doc. No. 29-9, Iseke Decl. ¶ 11; *see also* Doc. No. 29-2, James Opp'n Ex. B.  As a

result of this sign, Reynolds could not access the subject property and open its

recycling business.  Doc. No. 29-9, Iseke Decl. ¶ 13.

Also in October 2013, the City put out to bid the rental of the parcel

abutting the subject property, which the City holds in fee.  Reynolds was awarded

the contract and given a revocable permit from December 15, 2013 to December

15, 2014.  Doc. No. 14-2, Murata Decl. ¶ 11.

**B.     Procedural History**

*1.     The First Action*

On August 13, 2013, James filed her complaint in the First Action

alleging twelve claims titled (1) Violation of Fourth Amendment; (2) Due Process

Violation; (3) First Amendment Violation; (4) Failure to Train and Supervise;

(5) Hawaii Constitution -- Unreasonable Seizure; (6) Hawaii Constitution --

Property and Due Process Protections; (7) Hawaii Constitution -- Freedom of

Speech; (8) Trespass; (9) Conversion; (10) Replevin; (11) Negligence; and

(12) Trespass to Chattels.  All of these claims stemmed from the City's May 29,

2013 seizure and alleged damage of a sign James placed on the subject property.

The parties both filed motions for summary judgment, and while they

were pending, the City returned James' signs that were removed on May 29, 2013. The August 20, 2014 Order subsequently issued, denying both parties' motions for summary judgment.

On September 11, 2014, the parties entered into a Release, Indemnification and Settlement Agreement ("Settlement Agreement") whereby the City agreed to pay James $21 in exchange for release of "any and all claims, actions, causes of action, claims for relief, liabilities, demands, damages, injuries, and/or losses that have been alleged in the Lawsuit." *See* Doc. No. 14-10, City Ex. F. On September 15, 2014, the court approved and ordered the parties' Stipulation to Dismiss with Prejudice pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii).

### 2.    *This Action*

On October 17, 2014, James filed this action alleging the same twelve claims as in the First Action. The Complaint alleges verbatim many of the same allegations as in complaint in the First Action, with the only differences being the additional allegations regarding the October 18, 2013 seizure of James' signs and the City's interference with James' lease of the subject property to Reynolds. *See* Doc. No. 1, Compl. ¶¶ 34-35.

On February 27, 2015, the City filed a Counterclaim asserting that

James breached the Settlement Agreement by filing this action, and seeking attorneys' fees and costs.

On April 13, 2015, the parties filed Motions for Summary Judgment. Doc. Nos. 13, 16.  Oppositions were filed on June 8, 2015, Doc. Nos. 27, 29, and Replies were filed on June 15, 2015.  Doc. Nos. 30, 31.  A hearing was held on July 6, 2015.  One of the City's summary judgment arguments was that James improperly re-alleged claims that the parties settled from the First Action, and at the July 6, 2015 hearing, James admitted that she had simply added some new allegations to the Complaint from her First Action and that she did not intend the allegations from the First Action to be the basis of her claims in this action.  As a result, the court directed James to file a brief identifying what claims she is asserting in this action and the facts supporting each claim, to which the City would respond.  *See* Doc. No. 34.

On July 24, 2015, James filed her supplemental brief.  *See* Doc. No. 36.  The City filed its supplemental brief on August 3, 2015, Doc. No. 37, and James filed a supplemental opposition on August 17, 2015.  Doc. No. 39.  On August 24, 2015, the City filed a supplemental reply.  Doc. No. 40.  Also on August 24, 2015, the parties submitted statements as requested by the court regarding whether the October 18, 2013 seizure was pursuant to Article 19.  *See*

11

Doc. Nos. 39, 41, 42.

## III.  <u>STANDARD OF REVIEW</u>

Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Rule 56(a) mandates summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Broussard v. Univ. of Cal. at Berkeley*, 192 F.3d 1252, 1258 (9th Cir. 1999).

"A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact."  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) (citing *Celotex*, 477 U.S. at 323); *see also Jespersen v. Harrah's Operating Co.*, 392 F.3d 1076, 1079 (9th Cir. 2004).  "When the moving party has carried its burden under Rule 56[(a)] its opponent must do more than simply show that there is some metaphysical doubt as to the material facts [and] come forward with specific facts showing that there is a *genuine issue for trial*."  *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586-87 (1986) (citation and

12

internal quotation signals omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (stating that a party cannot "rest upon the mere allegations or denials of his pleading" in opposing summary judgment).

"An issue is 'genuine' only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute is 'material' only if it could affect the outcome of the suit under the governing law." *In re Barboza*, 545 F.3d 702, 707 (9th Cir. 2008) (citing *Anderson*, 477 U.S. at 248). When considering the evidence on a motion for summary judgment, the court must draw all reasonable inferences on behalf of the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *see also Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1126 (9th Cir. 2008) (stating that "the evidence of [the nonmovant] is to be believed, and all justifiable inferences are to be drawn in his favor" (citations omitted)).

## IV. <u>DISCUSSION</u>

### A.    James' Claims Alleged in this Action

The parties' Motions for Summary Judgment raise an important preliminary question, with which both the City and this court are still struggling -- what are James' claims in this action? James, proceeding pro se, filed this action by largely recycling her complaint in the First Action, even though the facts in this

action are different and it is unclear whether the same twelve claims alleged in First Action also apply in this action.  James admitted as much at the July 6, 2015 hearing, and the court subsequently required James to file a brief (1) identifying each claim she is asserting in this action; and (2) for each claim identified, outlining the facts that support such claim.  *See* Doc. No. 34.

Despite these clear instructions, James filed a 28-page brief that still leaves the court and the City with little help in identifying her claims.  *See* Doc. No. 36.  In particular, James' filing includes expansive allegations of government misconduct regarding not only the October 18, 2013 seizure of her signs and interference with her lease with Reynolds, but also regarding the City's decision to obtain possession of the subject property through eminent domain for the purpose of a fire station.  These new allegations were not in her Complaint and are therefore not part of this action.  As to her specific claims, James appears to allege most of the claims she alleged in the First Action, which includes claims for violations of her First, Fourth, and Fourteenth Amendment rights, violations of the Hawaii Constitution, and other state-law claims.  The court therefore addresses the parties' arguments as to these claims.

///

///

14

**B.     The City's Motion for Summary Judgment**

      The City argues that it is entitled to summary judgment because all of James' claims are based on the presumption that she has possessory rights to the subject property and that she was entitled to treat it as her own.  The City asserts that at the time of the events at issue in this action, the City had exclusive right to possess the subject property and did not open the subject property as a public forum such that all of James' claims fail.  Doc. No. 13-1, City Mot. at 12.  Although the court rejected a similar argument made by the City on summary judgment in the First Action, the City argues that the facts at issue in this action, which occurred later in time, raise no genuine issue of material fact that the City has exclusive possession of the subject property.  The court first addresses whether the City has established as a matter of law that it had possession of the subject property at the time of the events of this action, and then addresses James' claims.

*1.     The City's Possession of the Subject Property*

      Just as in the First Action, the parties dispute whether James or the City had possessory rights in the subject property, an issue relevant to all of James' claims.  The August 20, 2014 Order in the First Action outlined this issue in detail and therefore provides much of relevant framework applicable in this action.

      a.    *Analysis/Framework from the August 20, 2014 Order*

The August 20, 2014 Order first determined that neither the events in the State Action nor the quick-take eminent domain statute, HRS § 101-29, answered whether, at the time of the events of the First Action, the City had exclusive possession of the subject property or whether James still had rights that she properly exercised by placing signs on the subject property.  *See James*, 2014 WL 4181461, at *5-6.

Specifically, the August 20, 2014 Order determined that the Possession Order was silent as to whether it granted the City exclusive possession of the subject property.  *Id.* at *5.  The Possession Order provides simply that the City "is hereby awarded possession of the real property described in the Complaint filed herein, and [the City] may do such work thereon as may be required for the purpose for which the taking of said real property, including its appurtenances and any improvements thereon, is sought."  *Id.*  Viewing this language on its face, the August 20, 2014 Order explained that the Possession Order says nothing about *exclusive* possession as a matter of law -- it merely "awarded possession" of the subject property to the City "to do such work as may be required" for a Hauula fire station.  The Possession Order offers no insight as to what rights may remain with James.  In other words, the Possession Order by its own terms does not necessarily

extinguish all of James' rights to the subject property and/or grant the City

absolute possession, but instead grants the City possession for the purpose of

constructing the Hauula fire station. *Id.*

   The August 20, 2014 Order further determined that HRS § 101-29

similarly fails to address this precise issue of whether, as a matter of law, the City

had exclusive possession of the subject property. *Id.* at *6. Rather, § 101-29

merely states that upon the appropriate showing, the State court will issue an ex

parte order putting the City "in possession of the real property sought to be

condemned and permitting [the City] to do such work thereon as may be required

for the purpose for which the taking of the property is sought." *Id.* Just as with

the Possession Order, this language suggests that possession is not absolute --

§ 101-29 does not grant the City free reign to do as it pleases with the subject

property, and the City may only do such work as may be required for the purpose

of the taking. Indeed, James still has title of the subject property until the end of

the condemnation action.

   Beyond the Possession Order, the August 20, 2014 Order found that

the facts, viewed in a light most favorable to James, suggest that the City failed to

take possession of the subject property at the time of the Possession Order and at

the time of the May 29, 2013 seizure. *Id.* Instead, the City affirmatively imposed

17

upon James several responsibilities of ownership of the subject property consistent

with James' right (or even obligation) to possess the subject property. *Id.* at *6-7.

Those rights included: (1) citing James for failing to maintain the lawn of the

subject property on September 14, 2011; (2) citing James for "Grubbing work w/o

a permit" on October 4, 2011, and (3) taxing James on the subject property from

2010 through 2013. *Id.* at *7.

The August 20, 2014 Order therefore concluded that "[t]hese facts

simply do not support the City's assertion that it had absolute, *exclusive*

possession of the subject property at the time it removed James' signs.  Rather, in

spite of the Possession Order, it appears that the City either did not exercise its

right of possession to the subject property (which it certainly could have done), or

at the very least shared possession with James at the time she erected her signs."

*Id.*  The August 20, 2014 Order explained, however, that this holding was limited

to the specific facts presented:

> This Order is limited to the City's narrow
> argument that it had the "exclusive right of possession"
> to the subject property, and the unique circumstances
> presented here where the City placed burdens -- and
> indica of ownership -- on James.  This Order does not
> mean to suggest that the Possession Order failed to give
> the City the right to possess the subject property, to the
> exclusion of all others, to carry out the public purpose
> for which the subject property was taken.  Rather, the
> court finds that fact questions exist as to whether, despite

the Possession Order and at the time James had erected
the signs, the City failed to take exclusive possession of
the subject property and/or gave (or shared with) James
certain rights of possession.  As a result, a question of
fact exists as to whether the City could unilaterally seize
James' signs at a time when the City had imposed indica
of ownership on James.

*Id.* at *8.

    b.    *Application to this case*

The analysis in the August 20, 2014 Order applies to this action --

just as with the First Action, neither the Possession Order nor HRS § 101-29

answers whether, at the time of the events comprising the present dispute, the City

had *exclusive* possession to the subject property.  But unlike in the First Action, at

the time of the events at issue in this action -- the October 18, 2013 seizure of

James' signs and the October 21, 2013 alleged interference with her lease with

Reynolds -- there was no genuine issue of material fact that the City had taken

exclusive possession of the subject property.

Specifically, after the May 2013 seizure of James' signs and the filing

of the First Action, the City made well known to James that, despite its earlier

mixed messages regarding James' possession, the City was now taking exclusion

possession of the subject property.  In particular, the City established

unequivocally that it was taking possession of the subject property by: (1) filing in

19

the State Action an August 15, 2013 Certification stating that the City took possession of the subject property on June 4, 2010, Doc. No. 14-17, City Ex. M; (2) notifying James' then-attorneys that James does not have a legal right of possession to the subject property, that neither James nor any other person is authorized to enter the subject property, and that any personal property found on the subject property will be removed without notice, Doc. No. 29-6, James Opp'n Ex. F; Doc. No. 14-21, City Ex. Q; and (3) issuing tax reimbursement checks on the subject property to James.  Doc. No. 14-18, City Ex. N.

These actions left no question that the City was exercising its right of possession of the subject property to the exclusion of James, and the City took no contradictory actions suggesting to James that she still had possession of the subject property (such as by taxing James and/or requiring her to maintain the property as it previously did).  Thus, this action stands in contrast to the First Action's "unique circumstances" where the City placed burdens and indica of ownership on James while at the same time exercising its right of possession. Rather, the Possession Order gave the City the right to possess the subject property to the exclusion of all others to carry out the public purpose for which the subject property was taken, and starting in August 2013, the City put James on notice that it was exercising that right going forward.

The court therefore finds that by the time of the October 2013 events that are at issue in this action, James did not have the right to possess the subject property.

### 2. *Application to James' Claims*

The court addresses each of James' claims in light of the City's possession of the subject property at the time of the events at issue in this action.

### a. *Fourth Amendment*

James asserts that the City violated her Fourth Amendment rights by coming on to the subject property and seizing her signs. The City argues that it is entitled to summary judgment on this claim because it acted reasonably such that there was no Fourth Amendment violation. The court agrees with the City.

The Fourth Amendment, made applicable to the states by the Fourteenth Amendment, protects "persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. *Lavan v. City of Los Angeles*, 693 F.3d 1022 (9th Cir. 2012), explains:

> The Fourth Amendment "protects two types of expectations, one involving 'searches,' the other 'seizures.' A 'search' occurs when the government intrudes upon an expectation of privacy that society is prepared to consider reasonable. A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property."

*Id.* at 1027 (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)).

Whether a search or seizure is at issue, the relevant inquiry under the Fourth

Amendment is one of reasonableness -- "[t]he Fourth Amendment does not

proscribe all state-initiated searches and seizures; it merely proscribes those which

are unreasonable." *See Florida v. Jimeno*, 500 U.S. 248, 250 (1991) (citations

omitted). Whether a seizure is unreasonable under the Fourth Amendment

depends upon the particular facts and circumstances. *See Miranda v. City of

Cornelius*, 429 F.3d 858, 862 (9th Cir. 2005).

　　　　　The court must balance the invasion of James' possessory interests in

the signs against the City's reasons for taking them. *See Lavan*, 693 F.3d at 1030.

And as this court explained in *Fuller v. Aila*, 2015 WL 127887, at *4 (D. Haw.

Jan. 7, 2015), reasonableness often turns on whether the search and/or seizure

occurs on private property (where individuals have a heightened privacy interest)

as opposed to public property (where individuals may still have a possessory

interest in their belongings). For example, absent an exception, the Fourth

Amendment generally proscribes warrantless "entr[y] onto *private land* to search

for and abate suspected nuisances." *Conner v. City of Santa Ana*, 897 F.2d 1487,

1490 (9th Cir. 1990) (citations omitted) (emphasis added). And although "[t]he

Fourth Amendment protects against unreasonable interferences in [personal]

property" that is on public property, a seizure may nonetheless be reasonable where the owner is given an opportunity to retrieve the property. *See Lavan*, 693 F.3d at 1028-29, 1030-31 (determining that a municipality seizes a homeless person's property unreasonably if it destroys the property before giving its owner a meaningful opportunity to retrieve it).

In light of the City's strong possessory interest in the subject property and given that the City provided advance notice and an opportunity to retrieve the property, the court finds no genuine issue of material fact that its actions of entering the subject property and seizing James' signs were reasonable.  James was well aware of the City's possession of the subject property, that the City would not allow James to place personal property on the subject property, and that James did not otherwise have permission to place them on the subject property. Further, James was given twenty-four hours notice pursuant to Article 19 that the signs would be removed, meaning that she could have simply removed the signs if she wished to keep them.  *See* Doc. No. 41-1, Kitsu Decl. ¶ 5; Doc. No. 41-2, City Suppl. Ex. A; *see also Lavan*, 693 F.3d at 1028-29, 1030-31.  Finally, when the signs were in fact seized, she was able to retrieve them from the City.  *See* Doc. No. 42, Pl.'s Suppl. Ex. 1.  Under these circumstances, the City's seizure of James' signs was reasonable as a matter of law.

23

The court therefore GRANTS Defendants' Motion for Summary Judgment as to James' Fourth Amendment claim.

### b.    Due Process

James asserts that the City violated her due process rights by seizing her signs pursuant to Article 19 without the opportunity for a hearing.[2]  The City argues that summary judgment should be granted on this claim because James was provided all the process that was due.  Based on the following, the court agrees with the City.

Under the Fourteenth Amendment, "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV.  "Property" for purposes of the Fourteenth Amendment includes an individual's personal possessions.  *See Fuentes v. Shevin*, 407 U.S. 67, 84 (1972).  Where a protected interest is implicated, the relevant question is "what procedures constitute 'due process of law.'"  *Lavan*, 693 F.3d at 1031 (quoting *Ingraham v. Wright*, 430 U.S. 651, 672 (1977)).

"The fundamental requirement of due process is the opportunity to be

---

[2]  James' July 24, 2015 Supplemental Filing further asserts that the signs were destroyed.  These allegations are not in the Complaint.  Further, such assertion is not supported by, and is actually contradicted, by the evidence -- James retrieved her signs after they were seized.  *See* Doc. No. 42, Pl.'s Suppl. Ex. 1; *see also* Doc. No. 29-1, James Opp'n Ex. A (photographs of signs being removed intact).

24

heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). "This inquiry [] examine[s] the procedural safeguards built into the statutory or administrative procedure of effecting the deprivation, and any remedies for erroneous deprivations provided by statute or tort law." *Zinermon v. Burch*, 494 U.S. 113, 126 (1990). As *Mathews* outlines, determination of what process is due is a fact-specific inquiry requiring consideration of three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

424 U.S. at 335.

This court has already addressed and applied this framework to a challenge to Article 19 in *De-Occupy Honolulu v. City & Cnty. of Honolulu*, 2013 WL 2285100, at *5 (D. Haw. May 21, 2013), in the context of a motion for preliminary injunction, and its legal analysis applies here.

First, James has a property interest in her signs, but this interest is weaker than in *De-Occupy*, or in *Lavan* (upon which *De-Occupy* relied), as both involved the seizure of items from homeless individuals. *See id.* at *6. *De-*

*Occupy* explains that balancing this property interest, Article 19 includes several

safeguards to prevent the erroneous deprivation of property, including that the

City must: (1) provide twenty-four hours written notice before items are seized,

ROH §§ 29-19.3(b), 29-19.4(a); (2) provide post-seizure notice describing the

items that have been taken and the location where they may be retrieved, ROH

§ 29-19.5(b); and (3) hold seized items for at least thirty days before destruction.

*Id.* Thus, "at every step -- pre-seizure, post-seizure, and pre-destruction -- the City

is required to 'announce its intentions' and allow Plaintiffs the opportunity to

either move their items away from public property to avoid seizure or retrieve

them post-seizure." *Id.* (citations omitted). *De-Occupy* describes that these

opportunities to prevent permanent deprivation of an individual's possessions

appear "wholly reasonable," given that the individual may avoid seizure by

"simply remov[ing] their items from public property within twenty-four hours of

notice being posted, and to avoid their destruction, [the individual] may simply

seek their return from the City." *Id.*

Thus, in sum, there are multiple opportunities to prevent permanent

deprivation of personal property, and a hearing, whether pre- or post-seizure,

would add little to prevent an erroneous deprivation. Indeed, it would only

increase the administrative burden, which, combined with the small risk of

26

erroneous deprivation, outweigh consideration of James' property interest in her signs (an interest which is considerably weaker than in *DeOccupy* and *Lavan* where the plaintiffs were homeless individuals and the defendants had taken some or all of their worldly possessions).

In opposition, James offers no arguments as to why this legal analysis does not apply here -- James offers no facts or evidence suggesting that the Article 19 procedure was not followed in this case (rather, the undisputed facts establish that the signs were seized pursuant to Article 19, Doc. No. 41-1, Kitsu Decl. ¶¶ 5-7), or any argument as to why the procedures offered by Article 19 are inadequate. Indeed, in this case, there is no dispute that James was given notice that the City would seize her signs before they were taken, and that she was able to retrieve her signs without any difficulty. *See id.*; Doc. No. 41-2, City Suppl. Ex. A; Doc. No. 41-3, City Suppl. Ex. B. These circumstances do not support a due process violation. As the result, the court GRANTS the City's Motion for Summary Judgment on James' due process claim.

> c.   *First Amendment*

James asserts that the City violated her First Amendment rights by seizing her signs. Whether viewed as a basic First Amendment violation of free speech or as a First Amendment retaliation claim, the City argues that summary

27

judgment should be granted.  The court agrees with the City.

        i.        Violation of free speech

Whether a restriction on speech violates the First Amendment depends on the nature of the government forum at issue, and the Supreme Court has identified three types of fora for purposes of this analysis.  First, traditional public fora are those such as streets and parks which have "immemorially been held in trust for the use of the public." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983).  Second, the government may create a non-traditional "designated public forum" by opening public property "for use by the public as a place for expressive activity," and such forum may be open to the general public for the discussion of all topics, or may be "created for a limited purpose such as use by certain groups . . . or for the discussion of certain subjects." *Id.* & *id.* n.7.  Finally, "[a]ny public property that is neither a public nor a designated public forum is considered a nonpublic forum." *Ctr. for Bio-Ethical Reform, Inc. v. City & Cnty. of Honolulu*, 455 F.3d 910, 919 (9th Cir. 2006) (citing *Preminger v. Principi*, 422 F.3d 815, 823 (9th Cir. 2005) (other citation omitted)).  A "nonpublic forum" is public property "which is not by tradition or designation a forum for public communication." *Perry*, 460 U.S. at 46.

In distinguishing between these fora, the Supreme Court has made it

28

clear that

> [p]ublicly owned or operated property does not become a "public forum" simply because members of the public are permitted to come and go at will. . . .  There is little doubt that in some circumstances the Government may ban the entry on to public property that is not a "public forum" of all persons except those who have legitimate business on the premises.  The Government, no less than a private owner of property, has the power to preserve the property under its control for the use to which it is lawfully dedicated.

*United States v. Grace*, 461 U.S. 171, 177-78 (1983) (internal quotations and citation omitted).

Applied here, the undisputed facts establish that the subject property is, at most, a non-public forum (if it is a forum at all).[3]  In particular, the subject property is a vacant lot on which a fire station is to be built, and the City never opened it to the public.  Indeed, this vacant lot stands apart from other nonpublic

---

[3]  Although the Supreme Court has outlined three distinct fora, it has also recognized that government properties may be "nonpublic fora or not fora at all."  *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677 (1998) (citing *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678-79 (1992)).  This court could find no examples of either the Supreme Court or the Ninth Circuit identifying a government property that does not qualify as any type of forum.  It stands to reason, however, that certain government properties that are not open to the public in any manner would to fit such category (*e.g.*, secured buildings, areas posing a hazard, secured military bases).  The subject property at issue here appears to fit in line with such properties -- it is a vacant lot on which the City intends to build a fire station, has not been open to the public, and private individuals would have no legitimate purpose to be on it.  But because the court finds that the City's actions were reasonable under the non-public forum analysis, the court does not venture into this gray area of whether the government property at issue does not constitute a forum whatsoever.

fora addressed by the courts in that the City never opened it to individuals and it was never used for communications for *any* purpose.  *See, e.g.*, *Lee*, 505 U.S. at 679 (determining that airport terminal was a nonpublic forum); *Perry Educ. Ass'n*, 460 U.S. at 46 (school mail facilities); *Greer v. Spock*, 424 U.S. 828, 838 (1976) (military base allowing civilian traffic).  Rather, the City notified James that the subject property "is not open to the public, and the Property is not a designated public for[u]m."  Doc. No. 29-6, James Opp'n Ex. F; Doc. No. 14-21, City Ex. Q. The court must therefore determine whether the City's restriction of activities on the subject property passes constitutional muster under the proper test for non-public fora.

Where a forum is non-public, the court's review of the restriction at issue is deferential:

> In addition to time, place, and manner regulations, the State may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speakers's view.  Such sparing treatment stems from the oft-recognized principle that the First Amendment does not guarantee access to property simply because it is owned or controlled by the government.

*Currier v. Potter*, 379 F.3d 716, 728-29 (9th Cir. 2004) (quotations and citations omitted); *see also Lee*, 505 U.S. at 679 (stating that restrictions on speech need

"survive only a much more limited review").

Thus, where a nonpublic forum is at issue, the court must inquire whether the challenged restriction is "reasonable in light of the purpose served by the forum," and is "viewpoint neutral." *Int'l Soc'y for Krishna Consciousness of Cal., Inc. v. City of Los Angeles*, 764 F.3d 1044, 1049 (9th Cir. 2014) (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985)). Under this "deferential" review, a restriction is "reasonable" "where it is 'wholly consistent with the [government's] legitimate interest in preserv[ing] the property . . . for the use to which it is lawfully dedicated,'" *id.* (quoting *Perry Educ. Ass'n*, 460 U.S. at 50-51), and it "need not be the most reasonable or the only reasonable limitation." *Id.* (citation omitted).  Further, reasonableness "must be assessed in the light of the purpose of the forum and all the surrounding circumstances." *Cornelius*, 473 U.S. at 809.

Viewing the evidence in a light most favorable to James, the court concludes that the City's actions were reasonable in light of the purpose of the subject property and the circumstances James presented to the City.  The City took possession of the subject property via the State Action for the purpose of building a fire station, and James has long contested the State Action.  After the City had taken down one set of James' signs in May 2013, the City informed James that it

31

had possession of the subject property, that the subject property was not a designated public forum, that neither James "nor any other person, is authorized to enter the Property for any purpose, including the placement of signs," and that any personal property found on the subject property would be removed without notice. Doc. No. 29-6, James Opp'n Ex. F; Doc. No. 14-21, City Ex. Q.  In other words, the City informed James that the subject property was not open to either her or the public at large, and that *any* activities by James or others -- regardless of the actor and/or the content of those activities -- were prohibited.  Under the circumstances, these actions by the City were reasonable -- the City wishes to build a fire station on the subject property, and allowing the public to use the subject property in any manner (regardless of the type of activity or the content of any speech on the property) would conflict with that purpose.

The court further finds that the City's subsequent seizure of signs that James placed on the subject property was reasonable.  This seizure was viewpoint neutral -- given the warning the City gave James, the City would have seized *any* property James placed on the property, regardless of whether it contained an expression of speech and regardless of the content of that speech.  And under all of the circumstances, the seizure was reasonable -- this is not a case where James was contesting the taking of the subject property by personally protesting on the

32

subject property, or even by placing signs on the subject property that could be easily removed.  Rather, James installed large signs on a semi-permanent basis with deep concrete footings, which even she admits would require at the very least a shovel to uproot.  *See* Doc. No. 39, Pl.'s Suppl. Opp'n at ECF 18 of 29.  Under these circumstances, the City was reasonable in removing these signs so that the subject property can be used to build a fire station.

The court therefore GRANTS the City's Motion as to James' First Amendment claim.

### ii.    First Amendment retaliation claim

As a to a First Amendment retaliation claim, James must establish that (1) the City's actions "would chill a person of ordinary firmness from future First Amendment activity," and (2) the "desire to chill [James'] speech was a but-for cause of the[] allegedly unlawful conduct."  *See Ford v. City of Yakima*, 706 F.3d 1188, 1193 (9th Cir. 2013) (citations and quotations omitted); *see also Skoog v. Cnty. of Clackamas*, 469 F.3d 1221, 1232 (9th Cir. 2006) (requiring the plaintiff to prove that the "desire to cause the chilling effect" was a "but-for cause of the defendant's action").

Assuming that James' placing a semi-permanent sign on the subject property constitutes protected speech, James has failed to raise a genuine issue of

material fact that the speech on the sign was the reason for the City removing it.

Rather, the undisputed evidence establishes that the City gave James multiple

written warnings that neither James "nor any other person, is authorized to enter

the Property for any purpose, including the placement of signs," and that "any

personal property found on the Property shall be removed without notice."  Doc.

No. 29-6, James Opp'n Ex. F; Doc. No. 14-21, City Ex. Q; *see also* Doc. No. 14-

17, City Ex. M.  In light of these warnings, the City would have removed *any*

property James placed on the subject property, regardless of whether such property

contained an expression of speech and regardless of the content of that speech.  *Cf.*

*Aydelotte v. Town of Skykomish*, 2015 WL 3965790, at \*5-6 (W.D. Wash. June 29,

2015) (dismissing First Amendment retaliation claim for failing to establish

causation where township removed signs from plaintiff's private property, for

which he did not have the required permit).  As a result, James has failed to raise a

genuine issue of material fact that the City removed James' signs to chill her

speech.

      The court therefore GRANTS the City's Motion for Summary

Judgment on James' First Amendment claim.[4]

---

[4]  Because the court grants the City's Motion for Summary Judgment on all of James' federal claims, the court likewise DENIES James' Motion for Summary Judgment to the extent directed to these same claims.

## C.    Supplemental Jurisdiction

Having granted summary judgment to the City on James' federal

claims, there are no federal claims remaining over which the court has original

jurisdiction.  *See Peralta v. Hispanic Bus., Inc.*, 419 F.3d 1064, 1068 (9th Cir.

2005) (explaining that a federal court has subject matter jurisdiction under

diversity of citizenship (28 U.S.C. § 1332) or through "federal question

jurisdiction" (28 U.S.C. § 1331)).  Rather, the only remaining claims are state law

claims over which this court has only supplemental jurisdiction.  *See* 28 U.S.C.

§ 1367(c)(3).  Supplemental jurisdiction applies to the City's counterclaim for

breach of settlement agreement -- such claim does not provide an independent

basis for the court's jurisdiction because the terms of the settlement agreement

were not made part of the order of dismissal in the First Action.  *See K.C. ex rel.*

*Erica C. v. Torlakson*, 762 F.3d 963, 967 (9th Cir. 2014) (explaining that courts

"have ancillary jurisdiction . . . only 'if the parties' obligation to comply with the

terms of the settlement agreement has been made part of the order of dismissal --

either by separate provision (such as a provision "retaining jurisdiction" over the

settlement agreement) or by incorporating the terms of the settlement agreement in

the order'").

Under 28 U.S.C. § 1367(c)(3), "district courts may decline to exercise

supplemental jurisdiction . . . if . . . the district court has dismissed all claims over which it has original jurisdiction[.]" "[W]hen deciding whether to exercise supplemental jurisdiction, 'a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity.'" *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988))). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors will point towards declining to exercise jurisdiction over the remaining state-law claims." *Acri v. Varian Assocs., Inc.*, 114 F.3d 999, 1001 (9th Cir. 1997) (en banc).

Judicial economy, convenience, fairness, and comity weigh in favor of declining jurisdiction over James' state law claims. The court therefore declines jurisdiction over James' remaining claims.[5]

## V. <u>CONCLUSION</u>

Based on the above, the court GRANTS the City's Motion for Summary Judgment as to James' federal claims. There being no other federal

---

[5] 28 U.S.C. § 1367(d) provides that "[t]he period of limitations for any claim asserted under subsection (a), and for any other claim in the same action that is voluntarily dismissed at the same time as or after the dismissal of the claim under subsection (a), shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period."

claims and no other basis for federal jurisdiction, the court declines to assert

supplemental jurisdiction over the remaining state law claims.  The state law

claims are dismissed without prejudice.  The Clerk of Court is directed to close the

case file.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, August 26, 2015.



/s/ J. Michael Seabright
J. Michael Seabright
United States District Judge

*James v. City & Cnty. of Honolulu*, Civ. No. 14-00478 JMS-BMK, Order (1) Granting in Part Defendant City and County of Honolulu's Motion for Summary Judgment, Doc. No. 13; and (2) Declining Supplemental Jurisdiction over Remaining State Law Claims